STATE of Wisconsin, Plaintiff-Respondent,

v.

Bobbie Tanta BOWEN, Defendant-Appellant.†

Court of Appeals

*No. 2014AP767–CR. Submitted on briefs November 4, 2014.
—Decided December 30, 2014.*

2015 WI App 12

(Also reported in 859 N.W.2d 166.)

† Petition for Review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John A. Pray* of *Frank J. Remington Center*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Marguerite M. Moeller*, assistant attorney general.

Before Curley, P.J., Brennan, J., and Thomas Cane, Reserve Judge.

¶ 1. BRENNAN, J. Bobbie Tanta Bowen appeals from a judgment of conviction entered after a jury found him guilty of felony bail jumping, resisting or obstructing an officer, and violating a domestic-abuse injunction; he also appeals from an order denying his motion for postconviction relief. He complains on appeal that the evidence produced at trial was insufficient to convict him of bail jumping as set forth by the relevant jury instruction. We disagree and affirm.

## BACKGROUND

¶ 2. On August 11, 2012, the State filed a criminal complaint in Milwaukee County Circuit Court Case No. 2012CF3991, charging Bowen with substantial battery (domestic abuse) and disorderly conduct (domestic violence). The complaint arose from incidents occurring on May 14, 2012, and August 9, 2012.

¶ 3. According to the complaint, on May 14, 2012, police were dispatched to a residence on 44th Street in the City of Milwaukee to investigate a domestic violence dispute. Upon arriving at the residence, F.B. told police that her boyfriend, Bowen, had physically assaulted her. The police then escorted F.B. to the hospital, where doctors stated that F.B. suffered a fractured rib and a perforated ear drum.

¶ 4. The complaint also alleged that on August 9, 2012, police were again dispatched to the 44th Street residence to investigate a domestic violence complaint. Upon arrival, an officer spoke with F.B., who stated that Bowen had come to the residence intoxicated, started a verbal argument with F.B., and accosted F.B. outside

her residence as she was attempting to get into her car. F.B. told police that Bowen took her keys, began yelling at her, and threatened to beat her if she called the police.

¶ 5. Following Bowen's initial appearance on August 12, 2012, the trial court issued a no-contact order, directing Bowen to "have **ABSOLUTELY NO CONTACT** with [F.B.] . . . [her] residence, subsequent residence, [her] workplace or other location." Bowen signed the order. On August 16, 2012, Bowen was released from custody on a $200 cash bail on the condition that he comply with the August 12 no-contact order.

¶ 6. On August 23, 2012, the trial court issued a domestic-abuse injunction, ordering Bowen to, among other things, "avoid [F.B.]'s residence and/or any location temporarily occupied by [F.B.]." Bowen was present when the injunction order was issued and was personally served with a copy of the order.

¶ 7. Thereafter, on September 5, 2012,[1] F.B. called police from the upper bedroom of her residence and told them she believed Bowen was breaking into her home. She believed the intruder was Bowen because she saw his truck parked in her driveway. She could hear commotion downstairs, including shattering glass, someone moving up and down the stairs, and sounds of things being moved around.

---

[1] The details of the events that transpired on September 5, 2012, are those set forth by the witnesses at trial as viewed in the light most favorable to the jury's verdict. *See State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990) (When reviewing a claim of insufficient evidence to support the verdict we must view the evidence in the manner most favorable to the State and the conviction.).

¶ 8. F.B. stayed hidden in her upstairs bedroom with the door locked until police arrived on the scene. When officers arrived, they found one of the downstairs windows broken, with a garbage can and chair stacked underneath. Officers believed that someone had broken into the house through the window. The officers entered the home and escorted F.B. out to the yard, then searched the residence.

¶ 9. Police officers found Bowen in the basement "concealed" by couch cushions and highly intoxicated. Officers demanded that he show them his hands, but Bowen refused to comply. Bowen struggled with officers and attempted to resist arrest. He was eventually arrested. After arresting Bowen, officers attempted to escort Bowen upstairs and out of the home. Bowen struggled and attempted to push the officers down the stairs.[2]

¶ 10. Following the September 5, 2012 incident, the State filed the complaint in Milwaukee County Circuit Court Case No. 2012CF4399, charging Bowen with felony bail jumping for violating the August 12 no-contact order, obstructing an officer, and violating the August 23 domestic-abuse injunction.

¶ 11. On September 14, 2012, the trial court consolidated the two cases against Bowen and set a trial date. However, because F.B. did not appear on the first day of trial, the trial court dismissed the substantial battery and disorderly conduct charges set forth in Case No. 2012CF3991.

¶ 12. A jury trial on the charges set forth in Case No. 2012CF4399 began on March 25, 2013. Following

---

[2] At trial, Bowen testified that the residence was his, not F.B.'s, and that he entered the house with a key. He testified that he fell asleep in the basement before being awakened by police, and denied resisting arrest.

testimony, the jury was instructed as follows, as relevant to the bail-jumping charge:

> The defendant is charged with violating a condition of bond that required that he not have contact with [F.B.].
>
> The State must prove by evidence which satisfies you, beyond a reasonable doubt, that the defendant knew of the term of bond that *he not have contact with [F.B.]* and knew his actions did not comply with that term of bond.

(Emphasis added.)

¶ 13. The jury found Bowen guilty on all three counts: bail jumping, obstructing an officer, and violating a domestic-abuse injunction. The trial court sentenced Bowen to thirty-two months of initial confinement, followed by thirty-two months of extended supervision for the bail-jumping count, and to two concurrent nine-month terms in the House of Correction on the obstruction and violation-of-injunction counts.

¶ 14. On December 26, 2013, Bowen filed a motion for postconviction relief, arguing that there was insufficient evidence to support the bail-jumping count as that count was explained to the jury in the jury instruction.[3] Bowen believed that the jury instruction required the jury to conclude that Bowen had personal contact with F.B.

¶ 15. The trial court denied Bowen's postconviction motion, stating:

---

[3] In his postconviction motion, Bowen also raised an ineffective-assistance-of-counsel claim. However, he explicitly states in his brief to this court that he is not raising that issue on appeal. As such, we deem Bowen's ineffective-assistance-of-counsel claim abandoned.

The court need not decide whether the victim's auditory perception of the defendant's presence in her home is sufficient to show that he had contact with her because the court does not accept the defendant's argument that the jury was required to find that he had personal contact with the victim in order to convict him of bail jumping under the instruction that was given. First, the court was not required to define "contact" for the jury or to instruct the jury that "contact" could include contact with the defendant's residence. [sic] Even assuming that an additional instruction on "contact" should have been given, the error was harmless because the record shows the jury understood the scope of prohibited contact under the no contact order.

Bowen appeals.

## DISCUSSION

¶ 16. On appeal, Bowen continues to complain that there was insufficient evidence to support the jury's verdict that he committed the crime of bail jumping as set forth in the jury instruction. We disagree and affirm.

¶ 17. The question raised by Bowen—whether the evidence is sufficient to support his conviction for bail jumping—is somewhat more nuanced than a typical sufficiency-of-the-evidence claim, in that he claims that the evidence fails to support the crime *as described in the jury instruction.* Bowen does not argue that the evidence at trial was insufficient to demonstrate that he, in fact, violated the terms of the August 12 no-contact order, nor could he. The August 12 no-contact order explicitly ordered that Bowen could "have **ABSO-LUTELY NO CONTACT** with [F.B.] . . . [*or her*] *residence.*" (Italics added.) There was plenty of evidence elicited at trial from which a reasonable jury could infer

that Bowen broke into F.B.'s home in violation of the no-contact order and thereby, the bond order.[4]

¶ 18. Bowen argues that, when reviewing the sufficiency of the evidence, we must be guided by the jury instruction and that the jury instruction in this case, which asked the jury to determine whether the evidence demonstrated that Bowen "had contact *with* [F.B.]," (emphasis added), required the State to produce evidence demonstrating that Bowen had "face-to-face physical proximity" with F.B. or made an "attempt to communicate" with her. In other words, Bowen contends that F.B.'s testimony that she *heard* breaking glass and someone moving around the house was insufficient to show that Bowen made "contact with [F.B.]" and thereby not enough to convict him of bail jumping as that crime was explained to the jury.

¶ 19. To obtain a conviction in a criminal case, the State bears the burden of proving each essential element of the charged offense beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). We may not reverse a conviction "unless the evidence, viewed most favorably to the [S]tate and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond

---

[4] The jury found Bowen guilty of felony bail jumping pursuant to Wis. Stat. § 946.49(1)(b) (2011–12). Section 946.49(1)(b) states: "Whoever, having been released from custody under [Wis. Stat.] ch. 969, intentionally fails to comply with the terms of his or her bond is . . . [i]f the offense with which the person is charged is a felony, guilty of a Class H felony."

All references to the Wisconsin Statutes are to the 2011–12 version.

a reasonable doubt." *Id.* "If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, [we] may not overturn a verdict even if [we] believe[ ] that the trier of fact should not have found guilt based on the evidence before it." *Id.* at 507.

¶ 20. "The [trial] court has broad discretion in instructing a jury." *See State v. Harmon*, 2006 WI App 214, ¶ 8, 296 Wis. 2d 861, 723 N.W.2d 732. We independently review jury instruction issues that involve definitions of statutory words. *Id.* However, Bowen's challenge is to the meaning of "contact" in the jury instruction, and neither the jury instruction nor the relevant statute defines the word "contact." We conclude that defining the meaning of a word in a jury instruction is akin to defining the meaning of a word in a statute. As such, determining the meaning of the word in a jury instruction is a legal question that we review *de novo*. *Cf. id.* And because the word "contact" is not defined in the jury instruction, we assign the word "contact" its "common, ordinary, and accepted meaning." *Cf. id.*, ¶¶ 10–11. "The common meaning of a word may be ascertained by resort to a dictionary." *Id.*, ¶ 11. Where there are multiple dictionary meanings, we look to the word's context and the statute's purpose. *Id.*, ¶¶ 12, 14.

¶ 21. "Contact" has multiple dictionary meanings. Definitions of "contact" in THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, include: "[a] coming together or touching," "[c]onnection or interaction," and "[v]isual observation." *Id.* at 406 (3d ed. 1992). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY also defines "contact" to mean: "to touch on all sides," "association or relationship," "direct experience through the senses,"

and "caused or transmitted by direct or indirect contact." *Id.* at 490 (1993). Thus, we see that the common meaning of "contact" can include touching and face-to-face interactions, as Bowen argues, but it can also include auditory observations and indirect contact of the type F.B. testified occurred here.

¶ 22. Furthermore, the jury heard testimony setting forth the definition of "contact" in the August 12 no-contact order. Officer James Neuzerling read the specific language of the no-contact order at trial, in the following exchange:

Q And turning to Exhibit 15, to the no contact order; officer, what was Mr. Bowen ordered as a condition of bail in his felony case?

A It is ordered effective immediately and also as a condition of release in this case that the defendant have absolutely no contact with the following witnesses or victims, their residence, subsequent residence, their workplace, or other location.

Q And who is Mr. Bowen ordered not to have contact with?

A [F.B.] is the named person.

Q And what does the order explain that no contact means?

A No contact means that you, the defendant, shall not contact the above persons or locations by telephone, in person, through the mail or any delivery service, by pager or fax or computer, or any other electrical . . . or electronic devices, or through other persons.

¶ 23. The terms of Bowen's August 16 bond order required him to comply with the August 12 no-contact order. The jury's task was to determine whether

669

Bowen had "contact with F.B." After hearing Officer Neuzerling's testimony, setting forth the definition of "contact" in the no-contact order, the jury concluded Bowen did have contact with F.B. The no-contact order broadly defines "contact" to include contact with F.B personally, at her home, or anywhere else, and expressly restricts contact by telephone, mail, pager, fax, computer, or even through another person. None of those forms of contact require any face-to-face connection. Clearly, the no-contact order itself shows that the common meaning of "contact" encompasses connections that are indirect and not face-to-face. This testimony was available for the jury to use as a basis for drawing the reasonable inference that "contact with F.B." in the jury instructions included hearing Bowen in her house. *See Poellinger,* 153 Wis. 2d at 507.

¶ 24. Additionally, defining the phrase "contact with [F.B.]" to include entry into F.B.'s residence while she was present is consistent with the *purpose* of no-contact orders, that is, to keep victims safe. It is an often-stated proposition that this court interprets language in a statute "in the context in which it is used, not in isolation but as part of a whole" and will "consider the scope, context, and purpose of the statute" in doing so. *Harmon,* 296 Wis. 2d 861, ¶ 10. While the phrase "contact with [F.B.]," is not contained in the bail-jumping statute but, rather, in the no-contact order and the jury instructions, it follows that the same principles should apply here. Narrowly defining the phrase "contact with [F.B.]" in the jury instruction to only include face-to-face contact or direct communication does not fulfill that purpose. F.B. heard Bowen break into her home through a window and then called the police. Common sense tells us that when F.B. heard Bowen in

her home, where she should have felt safe and secure, he made contact with her in a very personal way. As such, the phrase "contact with [F.B.]" can reasonably be defined as including auditory perceptions under these circumstances.

¶ 25. Nonetheless, Bowen still argues that "contact with [F.B.]" only includes face-to-face interactions. In support of that proposition, Bowen cites to WIS. STAT. § 813.12(1)(cj) and *State v. Schaab*, 2000 WI App 204, 238 Wis. 2d 598, 617 N.W.2d 872. Neither § 813.12(1)(cj) nor *Schaab* is on point.

¶ 26. WISCONSIN STAT. § 813.12(1)(cj) defines the phrase "[r]egular and direct contact," within the context of the *injunction* statute, which is not implicated here. This is a bail order no contact violation. Additionally, § 813.12(1)(cj) defines a particular type of contact, "[r]egular and direct," as "face-to-face physical proximity to an individual that is planned, scheduled, expected, or periodic." *Id.* However, the word "contact" within the context of the jury instruction before us is not qualified by the words "[r]egular" or "direct." For both reasons, § 813.12(1)(cj) is not on point.

¶ 27. Contrary to Bowen's claim, *Schaab* never addressed whether "contact" is required to be face-to-face. According to Bowen, *Schaab* "clarified that 'contact' requires more than perceiving another person through one's visual or auditory senses." *Schaab* does no such thing.

¶ 28. In *Schaab*, the trial court relaxed a no-contact order to permit Peter Schaab to have "incidental contact at work" with Christopher Krerowicz. *Id.*, 238 Wis. 2d 598, ¶ 2. Our analysis focused on the meaning of the phrase "at work" in the no-contact order, not on the word "contact." *Id.*, ¶¶ 10, 15. We upheld the preliminary hearing magistrate's decision that Schaab

671

did not violate the no-contact order. *Id.*, ¶ 15. We did not, as Bowen contends, "clarif[y] that 'contact' requires more than perceiving another person through one's visual or auditory senses." The plain and ordinary meaning of the word "contact" was not even before the court.

¶ 29. Bowen bases his argument on a footnote in *Schaab*, in which we stated the following:

> Even if Schaab's contact with Krerowicz were incidental, the State argues that Schaab's conversing with Krerowicz and exiting the restaurant with him was not incidental. We view this as too fine a splitting of hairs and too narrow a view of the concept of "contact." The bond condition allowed for contact between Schaab and Krerowicz. Contact is defined in part as "an establishing of communication with someone" and "to get in communication with." WEBSTER'S COLLEGIATE DICTIONARY 249 (10th ed. 1997).

*See Schaab*, 238 Wis. 2d 598, ¶ 15 n.4. That footnote can in no way be construed as "clarify[ying] that 'contact' requires more than perceiving another person through one's visual or auditory senses." Rather, the point we were making in the footnote in *Schaab* was that any communication between Schaab and Krerowicz was contact. Breaking and entering into a victim's home, in violation of a no-contact order, certainly communicates a message to that victim, even though no words may be spoken. That message—one of fear and intimidation—is exactly the sort of message no-contact orders are meant to prevent. Furthermore, our footnote in *Schaab* explicitly states that "[c]ontact is defined *in part* as 'an establishing of communication with someone.' " *Id.* (emphasis added; citation omitted). In other words, *Schaab* left open the possibility for "contact" to

be defined more broadly than " 'an establishing of communication.' " *See id.* (citation omitted).

¶ 30. In sum, the jury instruction requiring the State to prove that Bowen made "contact with [F.B.]" did not require the State to show that F.B. saw Bowen or that Bowen directly communicated with F.B. F.B.'s testimony that she saw Bowen's truck in the driveway, heard glass breaking, and heard someone walking up and down her stairs, combined with police officer testimony that Bowen was found intoxicated in F.B.'s basement, was sufficient to demonstrate that Bowen made "contact with [F.B.]." As such, we affirm.

*By the Court.*—Judgment and order affirmed.